**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RYAN WYNGARDEN,

                Petitioner,

                                CASE NO. 2:18-CV-13390
v.                             HONORABLE ARTHUR J. TARNOW
                                UNITED STATES DISTRICT JUDGE
WILLIS CHAPMAN,

                Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DENYING THE MOTION FOR THE APPOINTMENT OF COUNSEL, AND GRANTING A CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Ryan Wyngarden, ("petitioner"), confined at the Thumb Correctional Facility in Lapeer, Michigan, filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for two counts of first-degree murder, M.C.L.A. 750.316. For the reasons that follow, the petition for writ of habeas corpus is DENIED WITH PREJUDICE.

## I. Background

Petitioner was convicted of killing his sister and brother-in-law Gail and Rick Brink following a jury trial in the Ottawa County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

Gail and Rick were murdered at their home on Ransom Street on November 21, 1987. They had attended a wedding for one of Rick's high school friends, leaving the reception sometime around 11:00 p.m. That was the last time they were seen alive. When the two failed to appear at their respective jobs on Monday, Rick's parents and Rick's employer went to investigate. They made a gruesome discovery. Gail had been shot in the head three times while she was lying in bed. Rick had suffered two gunshot wounds to the left side of his head while seated in the driver's seat of his Blazer. The home did not appear to have been ransacked. A purse, two watches, identification, and wallet were on the kitchen counter; there was cash found throughout the house. Gail and Rick were still wearing jewelry at the time of their autopsies. No weapon, shell casings, or bullets were found at the crime scene; the only bullets found were in the victims' bodies. The initial police investigation failed to result in an explanation for what occurred and no arrests were made. However, the cold case unit of the Ottawa County Sheriff's Department once again turned their attention to the murders in 2011, re-investigating and re-interviewing several individuals. As a result of these efforts, defendant was arrested in January 2013.

At trial, the most damaging testimony came from defendant's wife, Pam Wyngarden (Pam). At the time of the murders, she and defendant were dating and her maiden name was Maracchini. Pam had a six month old son, Nathan, when she met defendant. Pam testified that on Saturday, November 21st, she told defendant that they needed to do laundry. They went to Pete's Laundromat at approximately 5:00 or 6:00 pm and did not get back home until 8:00 p.m. Defendant left for a couple of hours and Pam did not question where he was going. He came back later that night and they smoked marijuana and had sex before he left again. Pam did not see defendant again until Sunday, November 22nd at 9:00 a.m. when he came knocking on the door. Defendant was upset and holding his head. Pam testified "that's when he told me that he shot Rick and Gail." Pam asked defendant to leave and he did. But he called later and asked if he could come back over. Pam reluctantly agreed. Defendant said he was going to take Pam back to his house, but he first stopped at Rick and Gail's home. Pam testified: "we stopped at Rick's truck and that's when I saw Rick. Then Ryan grabbed my wrist, walked me to the house, to the bedroom, and that's where I saw Gail. He lifted up the pillow and said to me, 'If you go to the police or tell anybody what I did here, this could happen to you.'"

Pam testified that she went back to defendant's house for the rest of the night. Pam woke up at 6:00 a.m. Sunday morning to fix Nathan a bottle and noticed that defendant's friend, James Meacham (Jimbo), was over. Defendant told Jimbo that he just found out that his sister and her husband had been killed. [1] After Jimbo left, Pam asked defendant to take her home so that she could get ready for work. Before they left, defendant brought out a .22 revolver and showed it to her, along with a bag of clothes he had worn the night before. He put the things in the back of his car. In the car ride back to Pam's apartment, defendant again warned Pam not to go to the police or "what happened to Gail could happen to me, so I just felt like I had to do what he asked." Defendant asked Pam to provide an alibi and tell the police that they were at Roz Dirkse's (Roz) house doing laundry and watching her children.

Pam testified that when she asked defendant why he killed his sister and Rick defendant said that it was because "he was jealous and that he had a sexual relationship with his sister." Defendant did not want Rick to find out about it. Defendant told Pam that he had gone to Rick and Gail's home that Saturday night where they had a "heated discussion" about some family matter. Rick asked defendant to leave, but defendant came back saying he had car trouble. Pam testified that when Rick went out to his truck "that's when Ryan shot him." Defendant then went into the house. Gail was in bed and he shot her.

Pam testified that she attended the funerals and felt like she had to brush her knowledge "under the rug" and "pretend like it never happened." Three or four months later defendant reminded Pam of their alibi and the threat he previously made. On several occasions, defendant suggested blaming a motorcycle gang for the murders because he had heard a rumor that the man who lived in the house before Rick and Gail was a member of a motorcycle gang. When police interviewed Pam in December 1987, she told them that she and

---

[1]  Jimbo testified that he found out about the murders from defendant. Jimbo would often go over to defendant's house in the early morning to have coffee. One morning defendant answered the door and Pam was standing behind him and Nathan was on the ground. Defendant told Jimbo that Gail and Rick had passed away and Jimbo assumed that they had died of carbon monoxide poisoning or a house fire. Later that same day he learned from a co-worker that they had actually been murdered. Jimbo was not sure whether this happened on a Monday or a Tuesday. (Footnote original).

defendant were doing laundry at Roz's house. Pam proceeded to marry defendant approximately a year later and they had three children together—Caleb, Elisabeth (Elisa), and Benjamin. Pam was the family's breadwinner and defendant was a stay-at-home father and home-schooled their children over Pam's objections.

Pam testified that cold case detectives called defendant in September 2012 and set up interviews with both defendant and Pam. Pam testified that she was nervous about her October 1, 2012 interview. She and defendant drove separately to their interviews; Pam followed defendant because she did not know the way. Prior to the interview, defendant reminded Pam that the alibi was "true" and that they were at Roz's on the night of the murder. Pam's initial interview lasted approximately three hours. Pam ultimately admitted to the officers that the alibi she gave in 1989 was false. She did not reveal, however, that defendant had confessed to the murders because she was afraid she would be in trouble for withholding the information for all those years. Pam denied being forced or coerced by the detectives; her statement was voluntarily given. Pam simply could not "have this burden on my shoulders anymore."

Defendant was interviewed after Pam left. Pam testified that he called her at home after his interview and said "'I can't believe that you threw me under the bus.'" Defendant complained that the detectives must have mistreated her. When he got home he was still "ranting and raving" about the detectives. Pam did not feel the same way about the detectives as defendant; she did not believe she was mistreated. Defendant then proceeded to leave a "nasty message" on one of the officer's voicemail. Defendant also mentioned the motorcycle gang as an attempt to deflect attention. Defendant told Pam not to speak to the detectives again unless they had a lawyer there.

There was a three-month gap before the detectives contacted Pam at work on January 15, 2013. Pam elected to have a human resources representative present during the interview. Once again, Pam was not ready to tell the detectives that defendant was responsible for the murders and she did not implicate him at that second interview, but she did agree to meet with the detectives a third time on January 18, 2013. At the third meeting, the detectives met with Pam at the security office where she worked. The human resources representative escorted Pam to the office, but did not stay for the third interview. Pam testified that she had something "inside me ... it was time for me to lift the burden off

my shoulders to tell the detectives what I knew." Pam did not want Lisa there to hear what she had to say. Pam testified that her participation in the third interview was voluntary and she was not threatened, coerced or bullied. It was at this third interview that Pam finally revealed that defendant killed Rick and Gail. After Pam told the officers about the murders, they suggested that they move from the security office to the sheriff's department. Therefore, the third interview took place initially at Pam's work and then moved to the sheriff's department.

Defendant was arrested and remained in jail from the time of his arrest. Pam testified that she was interviewed a fourth time on October 31, 2013. At that time she provided additional information, including the fact that she had been to the murder scene the day after the murders and had seen the bodies. Pam testified that she provided the information voluntarily. She did not share it in any of the prior interviews because "I wasn't ready to tell them back then."

During cross-examination, defense counsel pointed out to Pam that she said "I can't remember" no less than 32 times during her first contact with the detectives. Defense counsel also noted that the detectives accused Pam of helping her old boyfriend, Jerry Himes (Jerry), break out of jail. At that first interview, Pam told detectives that the false alibi was her idea. She told them that she loved defendant and was confident he had nothing to do with the murders.

Defense counsel questioned Pam at length about her January 18th interview, pointing out that Pam initially consistently denied that defendant had anything to do with the murders. Pam denied that she was under pressure from detectives; she just was not ready to tell them everything. Defense counsel also pointed out inconsistencies between Pam's testimonies at the preliminary examination and at trial and the various statements she made in the four interviews.

The prosecutor presented evidence that defendant confessed to Daryl Cain (Daryl), a so-called jailhouse snitch. The prosecution also presented evidence of statements that defendant made to others, which were deemed "odd." His aunt Narva testified that both defendant and Gail called her the day before the murders. Gail complained that defendant owed her money. Defendant complained that Gail considered herself too good for their family; she had refused to allow their parents to park their trailer in her driveway. At Gail's funeral defendant asked Narva, "'Do you think I could've killed them?'"

Defendant also told Narva that Rick and Gail would "probably still be alive if they'd let his folks come out there and stay." In the days after the murder, defendant told his sister, Cheryl, "You know, sometimes I wonder if I couldn't have done this." Defendant told Cheryl that he could picture someone going down a hallway and telling Gail, "I'll be right back." At the time, Cheryl attributed defendant's behavior to shock. A family friend testified that she ran into defendant and his mother at Meijers and that they offered to sell her the waterbed in which Pam was murdered. Defendant talked about the crime and made troubling comments.

The prosecution also presented several witnesses to testify as to defendant's sexual relationship with his sister. Defendant's old girlfriend, Crys, testified that she remained friends with defendant even after they broke up. The week of the murders, a very emotional defendant told Crys that he and Gail had a sexual relationship as teenagers and that the "last time" he forced Gail. Defendant also told Crys about a time when he was on Rick's boat and was looking "lustfully" at Gail in a bikini when he noticed that Rick was watching him. Defendant told his stepson, Nathan, that he and Gail had a "touchy-feeling type thing" and that they came close to having intercourse. Sometimes Gail would say "no" but defendant would force her. Nathan's wife, Heather, testified that she was there when defendant said that he and Gail had a sexual relationship—"he said it was like exploring." Defendant described it as "natural teenager stuff."

Defendant presented a fair amount of evidence in his defense. He presented numerous witnesses in support of his theory that the Brinks were murdered either by: 1) a motorcycle gang that meant to kill the Brinks' predecessor owner of the Ransom Street home; or, 2) by Gail's employer because Gail had allegedly discovered certain "inconsistencies" or "irregularities" at work.

Defendant also testified at trial. Defendant explained the sexual encounters he had with Gail when they were young. When he and Gail were living in Florida—defendant was approximately 12 and Gail was approximately 10—they were both naked after a shower and they were "just comparing body parts, so to speak" and "[t]here was nothing sexual about it." Another incident occurred after the family moved back to Michigan and defendant was approximately 13 and Gail was 11. Defendant was "snooping" in his father's friend's car and found a marijuana pipe. He and Gail smoked it and were "two stoned brother

and sister" who "just groped on each other a little bit." While it was inappropriate, defendant denied that things progressed beyond that and denied ever forcing her. The third and final incident occurred when defendant was 14 or 15 and Gail was 13. Once again, they were high on marijuana. They were fully clothed. Gail straddled defendant but then complained that it hurt, so they switched positions with defendant on top. Nothing happened because Gail could hear their father wake up. Defendant denied raping Gail.

Defendant testified that he and Pam "infrequently" babysat for Roz. In fact, the only time he remembered babysitting for her was the night of the murders. That evening, he and Pam went to Pete's Laundromat. Pam did not have enough money to finish the laundry, so they went over to Roz's. There was some "gray area" but defendant remembered that Roz and her friend Amy went to a bar and came back around 2:00 a.m.

Defendant testified that at the time of the murders, defendant's parents had borrowed a camper and were living in defendant's driveway. They had sold their home and were without a place to stay for approximately a month and a half. Defendant received letters from the township saying that it was not permissible to have them living in the driveway. Gail refused to let their parents keep the camper at her house and defendant intended to go out and speak with her on Sunday. Defendant denied being angry; he understood that Gail had concerns about their youngest siblings being at her house. That Sunday, defendant was running low on gas and cigarettes and stopped at a gas station. He used the payphone to call Gail, but no one answered. He decided to go to Pam's house instead and arrived at approximately 1:00 or 2:00 p.m. He did not like spending the night at Pam's, so he believed he went home, though he had no independent recollection.

Defendant testified that he first heard about the murders on Monday at approximately 5:00 p.m. when he was at his brother Breck's house looking for his parents. Later that day, defendant went to Pam's. The news was on and defendant said "that was my sister and Rick." He was numb. Defendant testified that he and Pam "ended up making love and that's when my heart was knit to her and never been apart from her since until all this."

Defendant testified that he loved his sister. She co-signed on a car loan for him and even made one of his payments. They talked frequently.

Defendant denied being jealous of Rick and Gail's relationship. He denied any sexual or financial jealousy. He denied that it would bother him if Gail revealed to Rick what had happened when they were younger.

Defendant believed that Pam was mistreated in her interviews and that she was coerced into making statements against him. He testified that Pam's first interview at the sheriff's department in October 2012 was supposed to last a half hour, but she was in there for closer to three hours. Defendant admits that he began beating on the glass and demanding to know what was happening. He was worried about Pam, who had worked all week and had sore feet. Defendant denied that he was angry that Pam told officers that the alibi was a lie; he was merely "mystified" and "perplexed." After the interviews, Pam told defendant that the detectives told her not to confide in anyone "about what they did to her" or she would be charged. Thereafter, she put up a "wall" between her and defendant.

Defendant admitted that he tried contacting Pam from jail. He just wanted to understand why she was doing what she was doing. He was "grief-stricken" and probably sent 29 letters. He just wanted her to stop lying. The tenor of letters to friends and family changed over time. At first, defendant accused Pam of lying and simply wanting a divorce, but then defendant came to realize that maybe Pam had been manipulated. Defendant was convinced "this would not be happening if [the detectives] didn't pressure her in [ ] the way they did." Once he saw the tapes of the police interviews with Pam, he better understood what was happening. He likened it to "a wolf pack chewing on an innocent lamb." Defendant denied lying to Pam that their alibi had been confirmed; he thought the individuals who would have supported the alibi had been interviewed 25 years ago. Defendant still did not understand why Pam would falsely accuse him except for maybe the "movie rights that's been talked about in the family that may be available now." Pam was now "locked into this thing," meaning that she could not get out of telling the wrong story. Defendant admitted that he had numerous outbursts during the February 2013 preliminary hearing, calling Pam a liar and a "black hearted evil woman." Defendant believed that he was entitled to "some righteous indignation." The district court judge had him removed from the courtroom.

Defendant strenuously denied being involved in the murders and further denied ever threatening Pam. He cooperated with detectives and even

liked them after meeting them the first time, but "when you get put on the hot seat and they start grilling you, they're not so nice." He initially told detectives that he was "probably high" on the night of the murders and that he "thinks" he was babysitting for Roz. He could not remember who Roz might have gone out with, but explained that "it was a stressful situation and I hadn't thought about it in years ..." He also did not recall the specific time Roz returned. In one interview, defendant admitted that there was penetration with Gail, but claimed that he was in a stressful situation and may have said things that were not true. If defendant told his niece Michelle that he regretted not having a chance to apologize to Gail because he felt like he raped her, it was because he had just been arrested and was "neurotic" and "anxiety-ridden. I didn't choose my words carefully." In another call to his sister Lynn, defendant once again said he had raped Gail but claimed that the statement was "taken out of context ."

Defendant called fellow inmate Daryl "the baby raper" with "scummy teeth." Defendant spoke about the Bible and his 40–day fast while in jail. He admitted that he spoke about his case to "just about anybody that would listen," but maintained his innocence.

Defendant also presented Dr. Deborah Davis, Ph.D., who testified about memory. Her Power Point presentation was entitled Memory on Trial: Clues to Witness Accuracy, and dealt with evaluating someone else's memory and the conditions under which the memory is most likely to be accurate versus when it is most likely to be inaccurate. Davis explained that failures in memory could occur in encoding (the circumstances that existed when something is observed, i.e., time to observe, stress, impairment, focus, distraction, and trauma), storage (which was the interval between the observation and reporting), and retrieval (when a person was asked to recount the experience).

Davis testified that trauma impacted memory. For example, an individual might remember being mugged, but not be able to remember the details of the event. Stress, distress, and trauma not only affected encoding, but also affected retrieval. As another example, an individual may go into a test with full knowledge of the material, but the anxiety of the testing process may impair his ability to retrieve that information.

In terms of storage and the passage of time, Davis testified that people could completely forget something or the memory could become different from what really happened. Obviously, the longer the time

between an occurrence and retrieval, the more likely the information would get lost. Memories become faded and vague. There can also be "source dissociation" where an individual remembers the information, but not where it came from.

Davis testified that "interference" occurs when other things happen over time that changes the memory from what it once was. This might occur when an individual reads newspaper articles or hears another person's account of events. The unintentional consequence is that new information replaces the original information and potentially creates "false memories." Memory is a story "[a]nd if you change that story by thinking about it, by listening to other people's stories, by listening to the media and so on, then it changes the subjective sense of memory that you have about what happened." It is easier to adopt other people's suggestions and report simply on the belief of what happened, which leads to guessing. People may even come to "remember" things that never happened.

Davis testified that "relevance-supportive" knowledge can change over time. Meaning, an individual's past experience will tell him whether something is plausible, i.e., whether a person is capable of doing something. There is also the "hindsight effect," which tends to make individuals remember the past differently. The "memory is changing to fit what you know now or what you believe to be true now." There is the potential for "memory conformity" when an individual believes that someone has direct knowledge of an occurrence. When witnesses talk, their memories converge. "You're not just lying or anything. You're thinking, okay, it must be that way because everyone else seems to think so."

Davis testified that people such as therapists or police officers may suggest that an event is so important that it is unforgettable so that if an individual does not remember detail, they believe that the individual must "unblock" the alleged repressed memory, which is "a good recipe for creating some false memories." Some people have even provided detailed false memories of murdering family members "essentially through the way they're interviewed." An individual might guess if put under pressure. Multiple forensic interviews can create cumulative error. The "more suggestive interviews you're exposed to, the more memory is going to be affected[,] as well as the person can become more and more likely just to go along to get along and get it over with."

*People v. Wyngarden*, No. 321736, 2015 WL 4746277, at *1–7 (Mich. Ct. App. Aug. 11, 2015).

The conviction was affirmed on appeal. *Id., lv. den.* 499 Mich. 914, 878 N.W. 2d 280 (2016).

Petitioner filed a post-conviction motion for relief from judgment, which was denied. *People v. Wyngarden*, No. 13-37270-FC (Ottawa Cty.Cir.Ct., May 2, 2017). The Michigan appellate courts denied leave to appeal. *People v. Wyngarden*, No. 339743 (Mich.Ct.App. Feb. 20, 2018); *lv. den.* 503 Mich. 860, 917 N.W. 2d 72 (2018).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Petitioner was denied his Sixth and Fourteenth Amendment rights guaranteed by the US Constitution and Article 1 §§ 17, 20 Mich. const. 1963, where the prosecution vouched for the credibility of witnesses and rendered his personal opinion about petitioner's guilt.

II. Petitioner was deprived of US Const. Sixth and Fourteenth Amend. Rights and Art. 1 §§ 17, 20 Mich. Const. 1963, where trial judge sua sponte prohibited full cross examination of important prosecution witness based on 10 year limitation of prior conviction as required by MRE 609(c), without a sufficient state interest.

III. Petitioner was deprived of US Const. Sixth and Fourteenth Amend. Rights and Art. 1 §§ 17, 20 Mich. Const. 1963, by trial court's allowing the prosecution to present evidence under 404(b), so called "sexual jealousy" as motive for the homicides where the probative value was outweighed by its prejudicial effect.

IV. Petitioner was deprived of US Const. Sixth Amend. Right and Art. 1 § 20 Mich. Const. 1963, to the effective assistance of counsel where the trial counsel's performance fell below the objective standard of reasonableness thus rendering the conviction unreliable and unfair.

V. Petitioner was deprived of US Const. Fourteenth Amend. Rights and Art. 1 §§ 17 Mich. Const. 1963, to the effective assistance of counsel on a first appeal as of right.

VI. Petitioner was deprived of his right to a fair trial and due process of law guaranteed by the US Const. Sixth and Fourteenth Amend. Rights and Art. 1 §§ 17, 20 Mich. Const. 1963, where the trial court allowed a multiplicity of errors and cumulative effect caused prejudice to the petitioner.

VII. The trial court abused its discretion in refusing to allow Dr. Davis to testify to the interrogation techniques as utilized on Mrs. Wyngarden and failing to allow the video tapes into evidence to demonstrate interrogation techniques, thereby denying petitioner a fair trial.

VIII. The verdict is against the great weight of the evidence, it would cause a miscarriage of justice to allow the verdict to stand and the evidence is insufficient to sustain the conviction.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if

the state court arrives at a conclusion opposite to that reached by the Supreme

Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

### III. Discussion

**A. Claim # 1. Prosecutorial misconduct.**

Petitioner claims the prosecutor committed misconduct by vouching for the credibility of his witnesses.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)(citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). A prosecutor's improper comments will violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643-45. To obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of the posecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 567 U.S. 37, 48 (2012)(quoting *Harrington*, 562 U.S. at 103). Habeas petitioners must clear a "high bar" to prevail on a prosecutorial misconduct claim. *Stewart v. Trierweiler*, 867 F. 3d 633, 639 (6th Cir. 2018); *cert. den.* 138 S. Ct. 1998 (2018).

Petitioner claims that the prosecutor in his closing argument vouched for the credibility of the prosecution witnesses by repeatedly using terms like "we know," "I know," and "I believe" or his comment "that's just my opinion" when addressing the purpose behind a witness's testimony.

Petitioner raised this claim in his post-conviction motion for relief from judgment. The post-conviction judge denied relief:

> The prosecuting attorney is not permitted to vouch for the credibility of a witness. Nor is he permitted to express his personal belief as to guilt of the defendant unless he relates that belief to the evidence. However, the mere use of the words "we know" or "I know" or "I

14

believe" by the prosecuting attorney does not, ipso facto, amount to improper vouching. Instead, the question is whether, by the words used, the prosecuting attorney intended to vouch for the credibility of the witness or to place the prestige of his office behind the witness. "The prosecutor's remarks must be evaluated in light of the relationship or lack of relationship they bear to the evidence admitted at trial." The prosecuting attorney may "cure" any "taint" that would otherwise flow from the use of the words "we know" and "I know" or "I believe" by immediately rephrasing his argument and relating his argument to the evidence and to the reasonable inferences that flow therefrom.

Defendant argues that by saying that "we know" defendant told Rick that he was having car trouble, "we know" Rick when to assist the defendant, "we know" defendant shot Gail, and "we know" defendant wanted to keep his sexual interaction with Gail a secret, along with other references, the prosecutor improperly vouched for the credibility of the People's witnesses. However, a review of the trial transcripts reveals that the prosecutor's "we know" arguments referred to, and were based on, the evidence and testimony admitted during trial. Because the prosecutor related these comments to the evidence that had been presented, those comments do not constitute prosecutorial misconduct. The prosecutor was simply arguing what the evidence showed. A prosecutor need not confine his argument to the "blandest of all possible terms."

Defendant also argues that the prosecuting attorney offered his personal opinion about defendant's guilt. While it is true that the prosecuting attorney said "that's just my opinion" during closing argument, he was not referring to defendant's guilt, not was he implying that he had special knowledge of the facts of the case. Instead, he was offering a possible explanation for the behavior of Steve Prahl, a minor witness who added nothing to either the defense or the prosecution. The prosecutor commented on Prahl's "busybody" personality, not his credibility. [n.15 3/28/14, Trial Tr. at 24.] While it would have been better if the prosecutor did not say "in my opinion," the fact remains that this comment did not pertain to the veracity of Prahl. Immediately after that comment, the prosecutor added "I'll leave it up to you to figure out what you think of Mr. Prahl." The comment taken in context does not reveal any credibility determination or amount to prosecutorial misconduct. Even if it constituted misconduct, this one isolated comment regarding a minor witness does not require

reversal.

Further, the jurors were twice specifically instructed that "the lawyers' statements and arguments are not evidence" and that their decision must be "based only on the evidence admitted during the trial." [n.16 M Crim JI 2.3, 2.5, 2.6.] Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors.

*People v. Wyngarden*, No. 13-37270-FC, * 2-3 (Ottawa Cty.Cir.Ct., May 2, 2017)(additional internal citations omitted).

A prosecutor may not express a personal opinion concerning the guilt of a defendant or the credibility of trial witnesses, because such personal assurances of guilt or vouching for the veracity of witnesses by the prosecutor "exceeds the legitimate advocates' role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir.1999) (internal citations omitted). However, a prosecutor is free to argue that the jury should arrive at a particular conclusion based upon the record evidence. *Id.* The test for improper vouching for a witness is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. *United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987). "[G]enerally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis,* 170 F.3d 546, 550 (6th Cir. 1999)(internal citations omitted). The Sixth Circuit has never granted habeas relief for improper vouching. *Byrd v.*

*Collins,* 209 F.3d 486, 537 and n. 43 (6th Cir. 2000). Indeed, "[T]he Supreme Court has never specifically held that a prosecutor's vouching for the credibility of a witness resulted in a denial of due process." *Wilson v. Bell*, 368 F. App'x. 627, 632, n.3 (6th Cir. 2010). Even on direct appeal from a federal conviction, a prosecutor's alleged misconduct of arguing his personal belief, in a witness' credibility or in a defendant's guilt, must be flagrant and not isolated in order to be reversible. *United States v. Humphrey,* 287 F.3d 422, 433 (6th Cir. 2002).

The prosecutor did not argue that he had any special knowledge about the witnesses or the facts of the case that had not been presented to the jury. Although a prosecutor's repeated prefacing of his or her arguments with "I know," "I believe," or "I think" is not preferable, they do not rise to the level of prosecutorial misconduct where the prosecutor's comments are based on the evidence presented at trial and are isolated, as was the case here. *See Wogenstahl v. Mitchell*, 668 F.3d 307, 332 (6th Cir. 2012). Moreover, any alleged vouching for the credibility of witnesses did not rise to the level of a due process violation, in light of the fact that the jury was informed by the judge that the prosecutor's arguments were not evidence and the judge instructed jury as to the factors to consider in evaluating the credibility of the witnesses' testimony. (Tr. 3/28/14, pp. 39-42). *Byrd,* 209 F. 3d at 537-38. Petitioner is not entitled to habeas relief on his first claim.

**B. Claim # 2.  The confrontation claim.**

Petitioner next contends that he was denied the right to confrontation when the trial court refused to allow defense counsel to cross-examine Daryl Cain about any prior felony convictions that were more than 10 years old. [2]

The judge denied petitioner's claim on post-conviction review:

> During trial, Cain admitted that he then faced three counts of Criminal Sexual Conduct in the First Degree, including one count which required a mandatory 25 year minimum upon conviction. During cross examination, Cain admitted that he had been a "snitch" on 3 or 4 prior occasions when he was "locked up" and has received consideration from the authorities. Defendant (sic) also admitted that his prior record included "stealing" and "breaking into buildings." He also admitted that two counts of CSC were dismissed along with the mandatory 25 year minimum. Aside from one objection regarding the form of defense counsel's question, defense counsel was only once blocked from asking a question-a question which referred to the specifics of a CSC charge that he was then facing. The sustained objection was entirely consistent with the pre-trial agreement regarding the scope of inquiry into Cain's prior record. Again, the theory of admissibility is that the severity of defendant's prior record provided motivation for Cain to fabricate in order to reduce a draconian prison sentence. It was relevant that Cain faced a mandatory minimum of 25 years on his current charge and had a prior criminal history that could result in a greater sentence than was actually received. That Cain was accused of molesting a minor was irrelevant. Defendant was afforded an adequate opportunity to impeach Cain on the relevant aspects of his criminal record.

*People v. Wyngarden*, No. 13-37270-FC, * 4 (Ottawa Cty.Cir.Ct., May 2, 2017)(internal footnotes omitted)

---

[2]  Respondent argues that this claim is waived because trial counsel entered a stipulation with the prosecutor not to question Cain about specific prior convictions.  Petitioner argues in his fourth claim that trial counsel was ineffective for failing to object to the exclusion of Cain's prior convictions, thus, it would be easier to get to the merits of this claim.

The Sixth Amendment Confrontation Clause guarantees the accused the right to cross examine adverse witnesses to uncover possible biases and expose the witness' motivation in testifying. *See Davis v. Alaska*, 415 U.S. 308, 315-316 (1974). However, the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, that the defendant might wish. *United States v. Owens*, 484 U.S. 554, 559 (1988)(internal citations omitted). The Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing limits on a defense counsel's inquiry into potential bias of a prosecution witness; to the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, a witness' safety, or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Unlike the defendant in *Davis,* petitioner was not denied the right to attack Cain's possible bias or motivation to testify against petitioner, because he was able to impeach Cain with the fact that he was facing several charges of criminal sexual conduct, one of which carried a mandatory minimum twenty five year sentence. Cain admitted that these charges had been dismissed in exchange for his testimony. Counsel was also able to elicit from Cain an admission that he

had been a "snitch" on several occasions and that he had a prior criminal history of stealing and breaking and entering. Petitioner at most was prevented from attacking Cain's credibility with a prior felony conviction.

A defendant's right to attack a witness' general credibility enjoys less Sixth Amendment protection than his right to develop the witness' bias. *Hughes v. Raines,* 641 F. 2d 790, 793 (9th Cir. 1981). The Sixth Circuit indicated:

> "[T]hus, although *Davis* trumpets the vital role cross-examination can play in casting doubt on a witness's credibility, not all conceivable methods of undermining credibility are constitutionally guaranteed. In particular, the *Davis* Court distinguished between a "general attack" on the credibility of a witness--in which the cross-examiner "intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony"--and a more particular attack on credibility "directed toward revealing possible biases, prejudices, or ulterior motives as they may relate directly to issues or personalities in the case at hand."

*Boggs v. Collins,* 226 F. 3d 728, 736 (6th Cir. 2000)(*quoting Davis,* 415 U.S. at 316). The U.S. Supreme Court in *Davis,* in fact, only found the latter, particularized attack on a witness' bias and motivation to be a protected aspect of the right of confrontation. *Boggs,* 226 F. 3d at 737. In his concurring opinion, Justice Stewart emphasized that the U.S. Supreme Court in *Davis* "neither holds not suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination" concerning past criminal convictions. *Davis,* 415 U.S. at 321 (Stewart, J., concurring).

As the Sixth Circuit indicated in *Boggs, supra,* courts after *Davis* and *Van Arsdall* have adhered to the distinction made by those cases and by Justice Stewart in his concurring opinion that cross-examination as to a witness' bias, motive or prejudice is constitutionally protected, but cross-examination as to the general credibility of a witness is not. *Boggs v. Collins,* 226 F. 3d at 737.

In the present case, the excluded evidence of Cain's older conviction or convictions would have been used only to attack his general credibility, and not his bias or motivation for testifying against petitioner. As the Sixth Circuit has made clear in *Boggs, supra,* cross-examination as to the general credibility of a witness is not constitutionally protected. Moreover, petitioner had no constitutional right to impeach Cain with proof of his older convictions. *See e.g. Olson v. Little*, 604 F. App'x. 387, 396 (6th Cir. 2015).

Finally, any evidence of Cain's prior conviction or convictions would have been cumulative to other impeachment evidence, thus, the exclusion of these prior convictions did not violate petitioner's right to confrontation or his right to present a defense. *See Washington v. Renico*, 455 F.3d 722, 728-29 (6th Cir. 2006). Petitioner is not entitled to relief on his second claim.

### C. Claim # 3. The 404(b) evidence claim.

Petitioner next contends that his right to a fair trial was violated by the admission of evidence that he was sexually jealous of his brother in law, claiming that such evidence was more prejudicial than probative and admitted in

violation of M.R.E. 404(b)'s prohibition against the admission of prior bad acts evidence.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.* Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F. 3d 542, 552 (6th Cir. 2000).

Petitioner's claim that this evidence should have been excluded under M.R.E. 403 for being more prejudicial than probative does not entitle petitioner to habeas relief. The Sixth Circuit observed that "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F. 3d 536, 551 (6th Cir. 2012)(emphasis original). The Michigan Court of Appeals, in reviewing this claim, concluded that this evidence was relevant under Michigan law to establish petitioner's motive. *People v. Wyngarden*, 2015 WL 4746277, at * 14-16. This Court must defer to that determination.

Petitioner's claim that the state court violated M.R.E. 404(b) or any other provision of state law by admitting this evidence is non-cognizable on habeas

review. *See Bey v. Bagley,* 500 F. 3d 514, 519 (6th Cir. 2007).  The admission of "prior bad acts" or "other acts" evidence against petitioner at his state trial does not entitle him to habeas relief, because there is no clearly established Supreme Court law which holds that a state violates a habeas petitioner's due process rights by admitting propensity evidence in the form of "prior bad acts" evidence. *See Bugh v. Mitchell,* 329 F. 3d 496, 512 (6th Cir. 2003); *See also Adams v. Smith,* 280 F. Supp. 2d 704, 716 (E.D. Mich. 2003).

**D. Claims # 4 and # 5.  Ineffective assistance of counsel claims.**

Petitioner next argues in his fourth and fifth claims that he was denied the effective assistance of trial and appellate counsel.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test.  First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689.  Second, the defendant must show that such performance prejudiced his defense. *Id.*  To demonstrate

prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F. 3d 602, 617 (6th Cir. 2005).

Petitioner first argues that trial counsel was ineffective for failing to object to the prosecutorial misconduct he complains of in his first claim. To show prejudice under *Strickland* for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different. *Hinkle v. Randle,* 271 F. 3d 239, 245 (6th Cir. 2001). The prosecutor's arguments did not deprive petitioner of a fundamentally fair trial; petitioner is unable to establish that he was prejudiced by counsel's failure to object to these remarks. *Slagle v. Bagley ,* 457 F. 3d 501, 528 (6th Cir. 2006).

Petitioner next claims that trial counsel was ineffective for failing to object to the judge's decision to preclude him from questioning Daryl Cain about his older prior convictions.

M.R.E. 609(c) indicates:

Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date.

Any of Mr. Cain's convictions that were older than ten years old were inadmissible for impeachment purposes pursuant to M.R.E. 609(c), therefore, petitioner was not denied the effective assistance of counsel because of his attorney's failure to object to the trial court's decision to exclude these convictions from being used for impeachment purposes and/or stipulating to not using these convictions to impeach Cain's credibility. *See e.g. Pillette v. Berghuis,* 408 F. App'x. 873, 890-91 (6th Cir. 2010).

Petitioner next claims that trial counsel was ineffective for failing to investigate several individuals who had made statements that the victims had been the victims of mistaken identity and who also identified the actual shooter.

Petitioner does not name these individuals in his petition, his memorandum of law, or in his affidavit which he attached to his petition. Petitioner failed to attach any affidavits from these witnesses to his motion for relief from judgment, when he raised this claim in the state court, nor has he provided this Court with any affidavits from these witnesses concerning their proposed testimony and willingness to testify on petitioner's behalf. Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief. *See Workman v. Bell,* 178 F.3d 759, 771 (6th Cir. 1998). Petitioner has failed to attach any offer of proof or any affidavits sworn by the proposed witnesses. Petitioner has offered, neither to the Michigan courts nor to this Court, any evidence beyond his own assertions as to

whether the witnesses would have been able to testify and what the content of these witnesses' testimony would have been.  In the absence of such proof, petitioner is unable to establish that he was prejudiced by counsel's failure to interview or call these witnesses to testify at trial, so as to support the second prong of an ineffective assistance of counsel claim. *See Clark v. Waller,* 490 F. 3d 551, 557 (6th Cir. 2007).

Petitioner was also not prejudiced by counsel's failure to call these witnesses because their proposed testimony was cumulative of other evidence and witnesses presented at trial in support of petitioner's claim that his sister and brother in law's murders had been committed by a motorcycle gang as a result of mistaken identity. *Wong v. Belmontes,* 558 U.S.15, 22-23 (2009).  Because the jury was "well acquainted" with evidence that would have supported petitioner's claim that the victims were murdered by this gang, additional evidence in support of petitioner's defense "would have offered an insignificant benefit, if any at all." *Id.* 558 U.S. at 23.  Petitioner is not entitled to relief on his fourth claim.

In his fifth claim, petitioner contends that appellate counsel was ineffective for failing to raise his first, second, fourth, and sixth claims on his appeal of right.

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985).  However, court appointed counsel does not have a

constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Petitioner's claims are without merit. "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F. 3d 448, 452 (6th Cir. 2010)(quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Petitioner is not entitled to relief on his ineffective assistance of appellate counsel claim.

### E. Claim # 6. Cumulative error.

Petitioner next alleges that he is entitled to habeas relief because of cumulative error. The Sixth Circuit has noted that the United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle,* 291 F. 3d 416, 447 (6th Cir. 2002). Therefore, petitioner is not entitled to habeas relief on his cumulative errors claim. *Id.*

### F. Claim # 7. The expert witness claim.

Petitioner next claims that the trial judge denied him the right to present a defense when he refused to allow petitioner's expert witness, Dr. Deborah Davis, to testify about how certain police interrogation techniques could have caused petitioner's ex-wife Pam Wyngarden into falsely accusing petitioner of the murders. Petitioner sought to have Dr. Davis testify in three different ways: 1) general testimony concerning memory and false memory; 2) testimony regarding how certain police interrogation techniques are conducted; and 3) specific testimony as to how these interrogation methods were applied to Pam. Defense

counsel also sought to introduce portions of the videotaped interviews of Pam as evidence. The judge allowed Dr. Davis to testify regarding memory and false memory, but prohibited Davis from testifying about specific police interrogation techniques and how those techniques may have impacted Pam.

A state trial court's decision to exclude expert testimony is an exercise of judicial discretion. *See Buell v. Mitchell,* 274 F. 3d 337, 357 (6th Cir. 2001). Moreover, habeas review does not ordinarily extend to state court rulings on the admissibility of evidence. *Id.* To the extent that petitioner is claiming an error of state law, he would not be entitled to habeas relief on this claim. *Id.*

The Michigan Court of Appeals rejected petitioner's claim. The Michigan Court of Appeals noted that although the Michigan Supreme Court had ruled in *People v. Kowalski*, 492 Mich. 106, 821 N.W. 2d 14 (2012) that in certain situations a criminal defendant had the right to present an expert on the issue of false confessions, *People v. Wyngarden*, 2015 WL 4746277, at * 8-9, the Michigan Court of Appeals concluded that the holding in *Kowalski* was inapplicable to petitioner's case because Pam's statements were not "confessions." The Michigan Court of Appeals further concluded that unlike a false confession, Pam's statements were not "counterintuitive" or "beyond the common knowledge of the ordinary person." There was also no evidence presented that Pam possessed specific personality traits that made her more susceptible to coercive tactics. The Michigan Court of Appeals further noted that

28

unlike the defendant in *Kowalski,* Pam did not disavow the statements, she testified at trial, and was subject to cross-examination. The jury was also provided with limited testimony from the expert witness that Pam's interviews may have resulted in false memories. *People v. Wyngarden*, 2015 WL 4746277, at * 11–13 (internal footnote omitted).

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *See also Crane v. Kentucky,* 476 U.S. 683, 690 (1986)("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'")(internal citations omitted). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). The Supreme Court, in fact, has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689. The Supreme Court gives trial court judges "wide latitude" to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or

confusion of the issues. *Id.* (quoting *Van Arsdall,* 475 U.S. at 679).

Moreover, under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect. Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F. 3d 507, 511-12 (6th Cir. 2003).

Petitioner is not entitled to habeas relief because he failed to provide any clearly established Supreme Court precedent, or even any habeas case, which held that a state trial court violates a defendant's right to due process by precluding an expert from testifying about "police interrogation techniques"—not of a criminal suspect—but of a general witness. To obtain habeas relief, a petitioner must "identif[y] [a] decision from this Court directly on point[;]" it cannot merely be "similar to" Supreme Court precedent. *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015)(per curiam). "Because none of [the Supreme Court] cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court." *Id.* (quoting *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam)). Given the lack of holdings by the Supreme Court on the issue of whether a criminal defendant is entitled to present expert testimony on the issue of whether a witness has been coerced by

the police into making a false accusation, the Michigan Court of Appeals'
rejection of petitioner's claim was not an unreasonable application of clearly
established federal law. *See Wright v. Van Patten,* 552 U.S. 120, 126 (2008).

### G.  Claim # 8.  The great weight of the evidence claim.

Petitioner claims that the verdict went against the great weight of the
evidence.

A federal habeas court has no power to grant habeas relief on the ground
that a state conviction is against the great weight of the evidence. *Cukaj v.
Warren,* 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004); *Dell v. Straub,* 194 F.
Supp. 2d 629, 648 (E.D. Mich. 2002); *See also Nash v. Eberlin*, 258 F. App'x.
761, 764, n. 4 (6th Cir. 2007)("a manifest-weight-of-the-evidence argument is a
state-law argument")*; Artis v. Collins,* 14 F. App'x. 387 (6th Cir. 2001)(declining
to grant certificate of appealability to habeas petitioner on claim that jury's verdict
was against the manifest weight of the evidence).  A claim that a verdict went
against the great weight of the evidence is not of constitutional dimension, for
habeas corpus purposes, unless the record is so devoid of evidentiary support
that a due process issue is raised. *Cukaj,* 305 F. Supp. 2d at 796.  The test for
habeas relief is not whether the verdict was against the great weight of the
evidence, but whether there was any evidence to support it. *Dell,* 194 F. Supp.
2d at 648.  As long as there is sufficient evidence to convict petitioner of these
crimes, the fact that the verdict may have gone against the great weight of the

evidence would not entitle him to habeas relief. *Id.*

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). A court need not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original).

A federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim merely because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless

uphold." *Id.*

Under Michigan law, "[T]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x. 147, 150 (6th Cir. 2003)(citing *People v. Turrell*, 25 Mich. App. 646, 181 N.W.2d 655, 656 (1970)).

In the present case, there was sufficient evidence for a trier of fact to conclude that petitioner was the person who murdered the victims. Petitioner admitted committing the murders to his wife and to Daryl Cain. "[A]n admission by the accused identifying himself (or herself) as the person involved in the (crime) is sufficient to sustain a guilty verdict when the crime itself is shown by independent evidence." *United States v. Opdahl*, 610 F. 2d 490, 494 (8th Cir. 1979); *See Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)(petitioner's identity as murderer supported in part by evidence that he confessed several times to murdering sister); *Sok v. Romanowski,* 619 F. Supp. 2d 334, 351 (W.D. Mich. 2008)(evidence sufficient to establish petitioner's identity as armed robber where his admissions placed him at the location of the crime).

To the extent that petitioner challenges the credibility of the prosecution witnesses, he would not be entitled to relief. Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence. *Martin v. Mitchell,* 280 F. 3d 594, 618 (6th Cir. 2002). An assessment of the credibility of witnesses is generally beyond the scope of

federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F. 3d

265, 286 (6th Cir. 2000).  The mere existence of sufficient evidence to convict

therefore defeats a petitioner's claim. *Id.*  Petitioner is not entitled to relief.

### H.  The motion for the appointment of counsel is denied.

There is no constitutional right to counsel in habeas proceedings. *Cobas*

*v. Burgess,* 306 F. 3d 441, 444 (6th Cir. 2002).  Because petitioner's claims lack

any merit, the Court will deny petitioner's request for the appointment of counsel.

*See Lemeshko v. Wrona*, 325 F. Supp. 2d 778, 788 (E.D. Mich. 2004).

### I.  A certificate of appealability.

A habeas petitioner must receive a certificate of appealability ("COA") in

order to appeal the denial of a habeas petition for relief from either a state or

federal conviction. [3] 28 U.S.C. §§ 2253(c)(1)(A), (B).  A court may issue a COA

"only if the applicant has made a substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2).  When a federal district court rejects

a habeas claim on the merits, the substantial showing threshold is met if the

petitioner demonstrates that reasonable jurists would find the district court's

assessment of the constitutional claim debatable or wrong. *See Slack v.*

*McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by

---

[3]  Effective December 1, 2009, the newly created Rule 11 of the Rules
Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll.
§ 2254, provides that "[t]he district court must issue or deny a certificate of
appealability when it enters a final order adverse to the applicant." Rule 11(a), 28
U.S.C. foll. § 2254.

demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37.

The Court concludes that jurists of reason would find its assessment of the constitutional claims debatable or wrong. *See Slack*, 529 U.S. at 484-85.  Any doubt regarding whether to grant a COA  is resolved in favor of the habeas petitioner, and the severity of the penalty may be considered in making that determination. *See Newton v. Dretke,* 371 F. 3d 250, 253 (5th Cir. 2004).  Any doubts regarding the issuance of a COA in this case should be resolved in petitioner's favor, in light of the nonparolable life sentence that he is serving. The Court issues petitioner a COA.  Petitioner is also granted leave to proceed on appeal *in forma pauperis*, as any appeal would be in good faith. *See* 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a); *Foster v. Ludwick*, 208 F. Supp. 2d 750, 765 (E.D. Mich. 2002).


## IV. CONCLUSION

For the reasons stated above, this Court concludes that Petitioner Wyngarden is not entitled to federal-habeas relief on the claims presented in his petition.

Accordingly, **IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**. (Dkt. # 1.).  The motion for the appointment of counsel (Dkt. # 9) is **DENIED.**  The Court issues petitioner a certificate of appealability and leave to proceed on appeal *in forma pauperis*.

s/Arthur J. Tarnow
**HON. ARTHUR J. TARNOW**

DATED: April 2, 2019                    UNITED STATES DISTRICT JUDGE